UNDER SEAL

### IN THE UNITED STATES DISTRICT COURT FOR THE

### EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No.: 1:19-mj-318 |
| | ) |
| JOHN RUSSELL KESTEL, | ) |
| | ) |
| and | ) |
| | ) |
| ANDREW DOHERTY KAVOIAN, | ) |
| | ) |
| Defendants. | ) |

**F I L E D**

**JUL 1 2 2019**

**CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA**

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Beau O. Bilek, being duly sworn, hereby depose and state as follows:

### I.   INTRODUCTION

1.      This affidavit is made in support of a criminal complaint charging John Russell KESTEL and Andrew Doherty KAVOIAN with Conspiracy to Manufacture and Distribute Anabolic Steroids, a Schedule III Controlled Substance, in Violation of Title 21 United States Code, Sections 841(a)(1) and 846.

2.      I have been a Special Agent with the Drug Enforcement Administration (DEA) for more than fourteen years.  Prior to my tenure at the DEA, I served as a Patrol Agent with the U.S. Border Patrol for more than five years.   As a Special Agent with the DEA, I have received specialized training in the ways, manners, and means used by those who unlawfully distribute controlled substances.  I have participated in investigations involving unlawful narcotics distribution, as well as in the execution of numerous search warrants, which resulted in the seizure of controlled dangerous substances and narcotics proceeds.  Through investigations and

1

training, I have also become familiar with the use by drug traffickers of telephones to
communicate, the patterns of activity of drug traffickers, the types and amounts of profits made
by drug dealers, and the methods, language, and terms that are used to disguise the activities and
nature of the profits from their illegal drug dealings.

3.      I am an "investigative or law enforcement officer of the United States" within the
meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United
States who is empowered by law to conduct investigations of and to make arrests for offenses
enumerated in Section 2516(1) of Title 18, United States Code.

4.      The information contained herein is based on personal knowledge, information
provided to your affiant by sworn law enforcement officers, and information obtained from
public records, cooperative witnesses, and other sources as indicated herein.

5.      Moreover, this affidavit is not intended to include each and every fact and matter
observed by me or known to the government relating to the subject matter of this investigation.
Instead, this affidavit contains only those facts which are necessary to establish probable cause to
support the issuance of a criminal complaint and arrest warrant against John Russell KESTEL
and Andrew Doherty KAVOIAN for violations of Title 21, United States Code, Sections
841(a)(1) and 846, conspiracy to distribute Schedule III controlled substances, to wit: anabolic
steroids identified as testosterone propionate, testosterone phenylpropionate, testosterone
decanoate, and testosterone cypionate, among others.

6.      Throughout this investigation, law enforcement officers and agents have worked
together to gather and record information about the illegal activities of those under investigation.
This affidavit is based in part on my personal knowledge derived from my participation in this

2

investigation and in part on information provided by other officers and agents who have
participated in this investigation.

**II.    PROBABLE CAUSE**

7.     In or around April 2017, special agents with the DEA in Northern Virginia
received information from multiple investigative agencies that shipping records reflecting that
pill press components, binding agents used in the tableting process, and parcels from companies
in China suspected of manufacturing controlled substances were all being shipped to addresses in
Springfield, VA, associated with KESTEL. The two main addresses listed as receiving these
materials were ████████████, Springfield, VA, ("Address 1") and ████████████
████, Springfield, VA ("Address 2"). Address 1 is identified as a UPS Store in Springfield, VA,
where records show that a private mail box was leased by KESTEL beginning in or around
February 2016. Address 2 is a private townhome-style residence which was KESTEL's
residence during the period relevant to the conduct described herein.

8.     The investigative material provided to me also included details about a parcel
originating in China that was seized during a border search by law enforcement on or about July
26, 2016, which contained 1.2 kilograms of anabolic steroids. Based on my training experience,
I know that anabolic steroids are classified as a Schedule III controlled substance pursuant to 21
United States Code, Section 812. The recipient of this parcel was identified on the package and
it is a person who is now known to me. I will refer to this person as uncharged co-conspirator 1
(UCC-1). UCC-1 resides in Rancho Cucamonga, CA. Financial records identify substantial
financial activity during this time frame between UCC-1 and KESTEL, among several other
individuals.

3

9.      On or about June 14, 2017, DEA agents including your affiant were surveilling Address 2 when they observed local law enforcement officers from the Fairfax County Police Department ("FCPD") enter the residence. The FCPD presence at the residence was unrelated to my surveillance activity. I subsequently learned that officers from the FCPD arrived in order to serve an arrest warrant for an individual who I will refer to as Cooperating Witness 1 ("CW-1"), whose identity is now known to me and who resided at Address 2. The FCPD did not encounter CW-1 at Address 2. However, the FCPD officers were granted consent to search for CW-1 by the lone occupant of the residence.

10.     This search revealed suspected controlled substances in plain view. The FCPD officers obtained a search warrant to search the residence for additional controlled substances. This search warrant was executed later in the day on or about June 14, 2017. The subsequent search confirmed that Address 2 is KESTEL's primary residence.

11.     During this search, equipment consistent with a clandestine laboratory were discovered in the basement of Address 2. The laboratory took up a large portion of the basement and consisted of a room containing a tableting machine (pill press) with quantities of powder in containers and a separate room containing glass vessels, heating and sterilization equipment, and shipping/packaging supplies. Large quantities of physical evidence from this laboratory were seized by the FCPD. The laboratory included a large amount of finished product; analysis by a law enforcement testing facility confirmed the presence of over five kilograms of anabolic steroids, listed in Schedule III of the schedule of controlled substances. These substances included (but were not limited to): testosterone propionate, testosterone phenylpropionate, testosterone decanoate, testosterone isocaproate, testosterone cypionate, testosterone enanthate, methenolone acetate, and methenolone enanthate. The majority of these controlled substances

4

were packaged for sale with labeling affixed and in a form (liquid or tablet) ready for consumption.

12.     A large amount of packaging and shipping supplies were found alongside the Schedule III steroids in the basement of Address 2, including, but not limited to, small plastic Ziploc bags which were used to package the tablets, and small 10 mL glass vials which contained liquid steroids. These glass vials containing liquid steroids had labels affixed to the side describing the substance within each vial and identifying the amount of substance in the vial. Many of these vials were labeled "Alpha Labz". Sheets of labels unattached to vials were also found. Larger quart sized clear plastic bags were found which were used to contain the bulk tablets with handwritten labeling such as "Clem" or "Ciagra". Scores of USPS Priority Mail boxes and envelopes were stacked near the steroids as well. A *Foodsaver* vacuum sealer, bubble wrap, and preprinted shipping labels were also found in this same area.

13.     Based on my training and experience, I know that this material described n paragraph 12, considered collectively with the large quantity of Anabolic Steroids seized, is consistent with the future distribution of controlled substances on a widespread scale.

14.     Near this packaging area were found numerous documents which appeared to represent orders from individuals requesting the same types of steroids recovered from the clandestine laboratory at Address 2. Several of these documents were labeled as invoices with the name "Alpha Labz" at the top, matching the labels of the glass vials. These invoices included a delivery address, billing address, payment method, product description (unit price, quantity), and price total. These documents listed the products as "ANADROL", "DIANABOL", "MAST E", "TEST PROP" and "TMT" among others. Based on my training and experience, I know these descriptions to refer to Schedule III anabolic steroids.

15.     Located in a separate room from the packaged steroids and shipping items was an area containing a tableting or pill press machine which combines an active ingredient with a binding agent to create a tablet or pill for consumption.  Near the pill press was a shelving unit which contained white plastic bins which appeared to contain powdered dyes.  On another shelving unit in the area by the pill press was found a clear plastic bag containing a white powdered substance with a label indicating it had been shipped from "The Press Club Nutrition" and which contained microcrystalline cellulose.  Based on my training and experience, I know that microcrystalline cellulose is commonly used in vitamin supplements or tablets as a binding agent.  The reports received by DEA agents in or around April 2017 specifically mentioned parcels coming from "The Press Club Nutrition" manifested as containing microcrystalline cellulose as possibly being used in an illicit pill press operation.

16.     Next to this microcrystalline cellulose was a plastic Tupperware type bin which had a label which read "Clomid  1:3 – 8mm  RED".  I believe this represents the finished product of clomid/clomifene or clomiphene citrate with a ratio of substance to binding agent, pill press dye size, and coloring used in the tablet.  Based on my training and experience, I know that Clomid is a substance commonly used in body building which increases testosterone levels.  Further, Clomid is only legally obtained in the United States with a doctor's prescription.

17.     Records obtained from the UPS Store where KESTEL leased a private box identified an email address used by KESTEL to create an account with UPS.  Information obtained from KESTEL's email address pursuant to a Federal search warrant included emails containing photographs of the pill press seized from the basement of Address 2 on or about June 14, 2017, described above.  In addition, the search of KESTEL's email address revealed emails containing invoices bearing the name "Alpha Pro Labs"  along with the same symbol as those

vials and invoices bearing the name "Alpha Labz" seized from the basement of Address 2 on or about June 14, 2017. One such invoice listed UCC-1 as a recipient and included a delivery address in Rancho Cucamonga, California, that matched the address received by the DEA in or around April 2017.

### A. KESTEL Uses "Resellers" Including CS-1 and Andrew KAVOIAN

18.     As described above, several invoices or order forms seized from Address 2 on or about June 14, 2017, mentioned recipients by name and address. One of these individuals was contacted by law enforcement in or around August 2017, and will be referred to as Confidential Source 1 ("CS-1"). CS-1 does not have a criminal record and voluntarily granted law enforcement an interview where they detailed their history of purchasing steroids from KESTEL. No promises or threats were made to CS-1 in exchange for information.

19.     CS-1, who knew KESTEL by the alias "Devan Banks," stated that he would resell steroids he had purchased from KESTEL at a profit. CS-1 would place aggregate orders for various clients on a website owned and operated by KESTEL, who would then ship steroids directly to the clients. CS-1 informed your affiant that he was one of several resellers, including Andrew KAVOIAN, working with KESTEL.

20.     CS-1 informed your affiant that KESTEL and UCC-1 utilized a private Facebook group to solicit interest in the purchase of steroids. Once the interest of a prospective customer was confirmed through interactions on social media, they were directed to KESTEL's password protected website. In addition, KESTEL and CS-1 would utilize encrypted communications applications to discuss the illicit sale and distribution of steroids and related products. CS-1 stated that he would place orders with KESTEL on behalf of approximately 40 to 50 other clients.

21.     CS-1 stated that when he first began purchasing steroids from KESTEL in or around November 2014, he knew that orders placed on KESTEL's website were fulfilled by both KESTEL and UCC-1. Specifically, CS-1 knew that KESTEL provided "tabs," or oral steroids, while UCC-1 separately provided the "oils" or injectable steroids. At some point, CS-1 stated that KESTEL began producing "oils," as well.

22.     One invoice seized from the clandestine laboratory located at Address 2 on or about June 14, 2017, bore the address of a storefront in Lomita, California, that leases private mailboxes. Records obtained from that company revealed that the mailbox identified on the invoice seized at Address 2 was leased by KAVOIAN.

23.     Information obtained pursuant to a Federal search warrant from a computer seized at Address 2 on or about June 14, 2017, along with financial records obtained by your affiant revealed that from at least September 2016 through at least September 2017, KAVOIAN was placing orders for steroids with KESTEL on behalf of others. Specifically, KAVOIAN sent text messages to KESTEL in order to update orders submitted on behalf of others for "test prop." Based on my training and experience, I know that "test prop" refers to testosterone propionate, a Schedule III anabolic steroid.

24.     CS-1 informed your affiant that at times when KESTEL was unable to fulfill orders for steroids and related products, KESTEL told CS-1 that he could place orders with KAVOIAN.

25.     In or around September 2018, an individual who shall be referred to as Confidential Source 2 ("CS-2") and who resides in Fort Worth, Texas, informed your affiant that he purchased both "oils" and raw steroid components from KAVOIAN. In or around February 2019, on the instructions of DEA special agents including your affiant, CS-2 placed an order for

anabolic steroids with KAVOIAN, and requested that the anabolic steroids be shipped to an address within the Eastern District of Virginia. KAVOIAN agreed to supply the anabolic steroids and requested that CS-2 make payment to a PayPal account identified by email address andykavoian@gmail.com. In or around March 2019, a parcel arrived at the address provided to KAVOIAN containing substances labeled as testosterone propionate, trenbolone enanthate, and anavar. Based on my training and experience, I know that these substances are Schedule III anabolic steroids.

B. KESTEL Engages in Aggravated Identity Theft

26.     In or around January 2017, KESTEL created accounts at several financial institutions, including Wells Fargo Bank and Circle Internet Financial, Inc., in the name of CW-1. At the time the accounts were created, CW-1 was incarcerated in Florida for unrelated crimes. KESTEL created these financial accounts under the false name in order to conceal the scope of his financial activity involving his illegal drug distribution business.

27.     In order to create an account at Circle Internet Financial, Inc., KESTEL transmitted a photograph of himself holding a Florida driver's license bearing CW-1's name and KESTEL's photograph. The Florida driver's license transmitted by KESTEL to Circle Internet Financial, Inc. bore license number F623███████████. Records obtained by your affiant revealed that this number corresponds to CW-1's Florida driver's license number.

28.     CW-1 informed your affiant that they did not give KESTEL permission to use their name or identity in order to create these accounts. According to CW-1, at the time the accounts were created, CW-1's Florida driver's license had been revoked.

29.     In addition, the documents seized from the basement of Address 2 on or about June 14, 2017, included a cellular telephone bill for an account in the name of CW-1, listing

Address 1 as the billing address. The cellular telephone account was opened in or around May 2017, when CW-1 was incarcerated. Further, the payment account associated with the cellular telephone account was a Wells Fargo account in CW-1's name that had been opened in or around January 2017.

### C. KESTEL and Others Engage in Money Laundering To Further the Drug Trafficking Conspiracy

30.     CS-1 informed your affiant that over the course of his partnership with KESTEL, they made at least twelve (12) cash deposits into Wells Fargo accounts purported to belong to CW-1 totaling approximately $52,484. CS-1 was aware that the true owner of the accounts was KESTEL. The purpose of the cash deposits was to promote the carrying on of the steroid distribution scheme and to conceal the proceeds of the illegal steroid distribution scheme.

31.     Records obtained from Wells Fargo and PNC Bank revealed that between in or around January 2016 and June 2017, KAVOIAN made at least 144 transfers from a PayPal account in his wife's name to a Wells Fargo account in CW-1's name and a PNC Bank account in KESTEL's name totaling approximately $88,824.76. At least one of these transactions matches an invoice seized from Address 2 on or about June 14, 2017, in both timing and amount.

32.     Records obtained from online financial services providers Venmo, PayPal, and Coinbase revealed that beginning as early as in or around August 2015 through at least June 13, 2017, KESTEL created accounts using various names, including CW-1, the Devan Banks alias, as well as other aliases and the names of other real people, and frequently changed the names on these accounts to promote the carrying on of the steroid distribution scheme and to conceal the proceeds of the illegal steroid distribution scheme.

### D. KESTEL Unlawfully Purchases and Possesses a Firearm

33.    In or around June 2017, CS-1 asked KESTEL if he would trade steroid products in exchange for a firearm.  Specifically, CS-1 offered to trade an AR-style rifle worth approximately $1,200 to KESTEL in exchange for anabolic steroids.  CS-1 subsequently shipped the firearm from Florida to Virginia.  CS-1 informed your affiant that he never received the steroid products promised by KESTEL in return for the firearm.  According to CS-1, KESTEL informed CS-1 that he could not fulfill CS-1's order because he had been "raided."

34.    A Daniel Defense AR-style rifle was seized from Address 2 on or about June 14, 2017.

35.    In or around August 1999, KESTEL was convicted of dealing in stolen property, a felony, in Fort Pierce, Florida.  Based on my training and experience, I know KESTEL is prohibited from possessing a firearm pursuant to Title 18, United States Code, Section 922(g).

### E. KESTEL Travels Outside the United States

36.    Shortly after the search of Address 2 and the seizure of the illicit materials found there, KESTEL traveled to Peru and remained there for approximately six months.  In or around November 2017, KESTEL returned to the United States and again resides within the Eastern District of Virginia.

37.    According to records provided to your affiant by the Department of Homeland Security, KESTEL traveled to Hong Kong, China, in or around March 2019.  Specifically, KESTEL traveled to Hong Kong from Dulles International Airport, within the Eastern District of Virginia, arriving on or about March 1, 2019.  KESTEL then departed Hong Kong and returned to Dulles International Airport on or about March 9, 2019.  Based on my training and experience, I know that China is a source nation for many controlled substances, including the base

11

components necessary for the manufacture of anabolic steroids.  Further, CS-1 stated that KESTEL informed CS-1 he received raw materials for the manufacture of anabolic steroids from China.

## CONCLUSION

38.     Based on the foregoing facts, there is probable cause to believe that from at least in or around December 2015 through at least June 2017, in the Eastern District of Virginia and elsewhere, John Russell KESTEL and Andrew Doherty KAVOIAN knowingly and unlawfully engaged in a conspiracy to manufacture and distribute anabolic steroids, Schedule III controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

Beau O. Bilek
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before
me this ___12__ day of July, 2019.

_____/s/_____
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge